IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 28, 2012

## STATE OF TENNESSEE v. RYAN JAMES HOWARD

**Appeal from the Criminal Court for Washington County**
**No. 35110    Lynn W. Brown, Judge**

---

**No. E2011-01571-CCA-R3-CD - Filed January 10, 2013**

---

The Defendant, Ryan James Howard, was convicted by a Washington County Criminal Court jury of second degree murder, a Class A felony, and voluntary manslaughter, a Class C felony. See T.C.A. §§ 39-13-210, -211 (2010).  He was sentenced to consecutive terms of twenty years for second degree murder and five years for voluntary manslaughter.  On appeal, he contends that (1) the evidence is insufficient to support his convictions and that the trial court erred in (2) allowing hearsay testimony into evidence; (3) allowing unauthenticated recordings of telephone calls into evidence; and (4) sentencing him to an effective twenty-five years' confinement.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL, and CAMILLE R. MCMULLEN, JJ., joined.

Jeffery C. Kelly, District Public Defender, and William Carter Donaldson and William Louis Francisco, Assistant District Public Defenders, Johnson City, Tennessee, for the appellant, Ryan James Howard.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Dennis Wayne Brooks and Janet Vest Hardin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the stabbing deaths of Ted Gregg and Robert Brown.  At the trial, Jeff Draper testified that on the evening of February 4, 2009, he and Charles Gregg, Ted Gregg's father, went to Numan's, a local bar, to socialize with the victims.  He said he saw

Ashley Rose and a man he knew as Ryan Howard at the bar, although he did not know Mr. Howard personally. He could not identify the Defendant as Mr. Howard because he could not remember what Mr. Howard looked like. He said February 4 was the only time he was around Mr. Howard. He said Ms. Rose, Mr. Howard, and Ted Gregg left Numan's together about fifteen to twenty minutes before he and Charles Gregg left. He said he, Charles Gregg, and Mr. Brown left around 1:45 a.m. He said that he took Mr. Brown home and saw him go to his front door. He said Mr. Brown did not appear drunk.

On cross-examination, Mr. Draper testified that he and Charles Gregg arrived at Numan's around 11:30 p.m. and that Mr. Howard and Ms. Rose were already there. He did not recall Mr. Howard and Ms. Rose playing pool and denied seeing the victims drink. He said everyone socialized and talked but denied knowing the subject of the conversations because he played pool with the victims. He agreed the victims talked to Mr. Howard and Ms. Rose but said he did not pay attention to their conversation. He said that Ms. Rose's drink was knocked over, that he tried to catch the drink as it fell, that Ms. Rose accused him of knocking it over, and that he offered to buy her another drink, although Ms. Rose was angry and cursed at him. He said Ted Gregg calmed Ms. Rose, and he agreed Mr. Howard was not upset over the incident.

Mr. Draper testified that Ted Gregg told his father he was leaving the bar and that it was possible Charles Gregg asked Ms. Rose to stay, although he was playing pool at the time. He said Ted Gregg told his father and Mr. Brown that he was coming into some money soon. He said Mr. Brown told Ted Gregg that he "shouldn't be doing that" because Mr. Gregg would get hurt. He said that although he had never seen Mr. Gregg "swindle" people out of money, he heard rumors from other people. He said that the victims lived together in Betty Jo Brown's home in Keystone Complex and that Ted Gregg mentioned people being at the home that night.

Charles Gregg, Jr., testified that he saw his son and Mr. Brown at Numan's on February 4, 2009, and that Ms. Rose and the Defendant were also there. He said Ms. Rose was drinking but did not recall the Defendant's drinking. He said the Defendant seemed "level headed." He had two beers and said the victims split a pitcher of beer while playing pool. He said he spoke to the Defendant after Ms. Rose kissed him on the cheek. He said that the Defendant looked jealous and that he told the Defendant there was nothing to worry about because he and Ms. Rose were only friends. He thought he offered to buy the Defendant a beer. He said this was his only interaction with the Defendant. He did not see any problems between the victims and the Defendant at the bar.

Mr. Gregg testified that his son, Ms. Rose, and the Defendant left the bar together and that he and Mr. Draper took Mr. Brown home. He said Mr. Brown got out of the car and walked onto the porch but denied seeing Mr. Brown enter his home. He said that before his son left the bar, his son told him he was "going to make some money" and that he saw a fifty dollar bill in his son's hand. He denied knowing what his son meant and said his son did not have a job and had been released from jail about two months earlier. He agreed he thought his son might be planning something illegal.

On cross-examination, Mr. Gregg testified that Mr. Brown was concerned Ted Gregg might do something to get himself hurt. He denied thinking his son planned to threaten someone. He stated that he did not hear the Defendant threaten his son, that nobody spoke harsh words at the bar, and that the Defendant did not socialize much that night. He agreed it was possible he told the police that Ms. Rose was drunk and taking pain medication. He agreed he did not know what happened after he took Mr. Brown home.

On redirect examination, Mr. Gregg testified that his son and Ms. Rose had dated previously and that Ms. Rose claimed his son might have been the father of one of her children. On recross-examination, he stated that Ms. Rose told him she was looking for a used car and had $4000 to spend. He said his son did not mention Ms. Rose's having the money.

Chikenia Livingston testified that at the time of the victims' deaths, she lived in one of the buildings at Keystone Complex. She said that in the early morning hours of February 5, 2009, her upstairs bedroom window was open due to the hot temperature inside her home. She said her bedroom window overlooked the parking lot. She said that she saw a car pull into the parking lot around 2:30 a.m. and that one woman and two men were inside. She did not recognize them. She said the woman was younger than the men, had blondish-brown hair in a ponytail, and wore a jacket and jeans. She said one of the men had dark hair and "was thicker." She said the other man had a goatee and wore dark pants, a black hooded sweatshirt, and a black toboggan. She said the woman got out of the car on the driver's side.

Ms. Livingston testified that she heard people yelling and arguing later that night, that she looked out her window, and that she saw the woman and the man with the goatee arguing. She said the woman told the man to calm down. She said the man was cursing, although she could not understand what he said. She said that the woman held up her hands and that the woman said, "[N]o, no, no," while holding back the man with the goatee. She said the man pushed the woman and said, "I'm going to get that MF." She heard more yelling, and about five minutes later, she heard someone running outside her bedroom window. She identified a photograph of the Defendant as the man she saw wearing the black toboggan and arguing with the woman. The parties stipulated that the photograph was taken

-3-

on February 5, 2009. She said that her eight-year-old son found a dead body in the community playground a few hours later.

On cross-examination, Ms. Livingston testified that around 2:30 a.m., the police stopped her boyfriend inside the complex parking lot and that she took proof of insurance to the officer. She said she stayed outside until the officer left. She agreed she saw the car with the woman and two men about five to ten minutes after the officer left. She said the car was "red, rusty, older -- older model car, maybe a Toyota Corolla." She denied knowing which apartment they entered and agreed she did not know the subject of the Defendant and the woman's argument.

Johnson City Police Officer Chris Stine testified that he learned the Defendant was a suspect in a homicide, that he saw the Defendant's police booking photograph, and that he was told to go to an address on Rock House Road to determine if the Defendant was there. He and another officer watched the home from 300 yards away. He said he saw the Defendant, called for reinforcements, and waited for other officers to arrive. He said that after other officer arrived, he went to the back of the home to ensure nobody tried to leave the home. He said the Defendant was found in the attic.

Johnson City Police Investigator Joe Harrah testified that he assisted in searching the Rock House Road home and that he found a kitchen knife in the area behind the home. The record shows the blade was bent. On cross-examination, he stated that although the knife was sent for testing, he did not know the results. He agreed he did not know how long the knife had been behind the home or how the blade became bent. He denied that the police stepped on the knife while searching the area. He agreed nobody attempted to bury or to hide the knife.

Betty Jo Brown testified that Mr. Brown was her brother, that Mr. Gregg's body was found inside her home, and that Mr. Brown's body was found in the nearby playground. She was not home when the victims were killed. She said that she last heard from her brother on the night of February 4, 2009. She said he sent her a text message stating that he was going to Numan's. She said that she had assorted kitchen knives, which she stored in a drawer and in two "blocks" on the kitchen counter, and that the police took all the knives. She said that the kitchen knife found by Officer Harrah at the home on Rock House Road was her knife and that she stored the knife in a drawer.

On cross-examination, Ms. Brown testified that she called Numan's and spoke to Mr. Brown, who told her he and Ted Gregg were having a good time. She agreed that she told the police Mr. Brown sounded like he had been drinking "quite a bit" and that Mr. Gregg sounded drunk. She agreed the victims drank liquor earlier that day. She agreed Mr. Gregg's

-4-

car did not work the night of the killings. She said her brother was about 6'1" to 6'2" and weighed about 195 to 200 pounds.

Stephen Helmbrecht testified that he was the assistant manager and a bartender at Numan's Café & Billiards and that he worked the night shift on February 4, 2009. He said that it was not crowded that night and that last call was at 2:00 or 2:15 a.m. He saw the Defendant enter the bar sometime between 11:00 and 11:45 p.m. with Ms. Rose. He recalled the Defendant's wearing a hooded sweatshirt and jeans, a large coat over the sweatshirt, and a dark toboggan. He served the Defendant two drinks and saw the Defendant and Ms. Rose playing pool. He said the victims came to the bar that night with a third person he did not know. He said that the Defendant and Ms. Rose left ten minutes after "last call" but that the Defendant returned, walked over to Mr. Brown, whispered in Mr. Brown's ear, and left with Ms. Rose and Mr. Gregg.

Johnson City Police Investigator Bob Odom, an expert in blood stain pattern analysis, testified that he went to the crime scene with Officer Dillard and that he saw Mr. Brown face down in the mulch surrounding the community playground. He said Mr. Brown was stabbed in the throat and the upper chest. He followed a blood trail from the victim's body to a nearby apartment, went inside the apartment through the unlocked screen door, and found Ted Gregg lying on the kitchen floor. Seven photographs were received as exhibits showing the victims' bodies, the blood trail, and blood spatter patterns surrounding Mr. Gregg.

Investigator Odom testified that he concluded from blood spatter patterns found inside the kitchen that Mr. Gregg's injuries were consistent with being inflicted with a knife. He said that based on the blood spatter on the kitchen appliances, it was his opinion that Mr. Gregg was "low to the ground" when the wounds were inflicted. He identified a photograph of blood on broken glass. He concluded that the glass was on the floor before the blood spattered. He agreed the glass could have been broken because of a struggle but said there was no evidence of a struggle in any other part of the home. He concluded that Mr. Gregg was first stabbed near the kitchen sink based on the blood spatter patterns on the kitchen counter and the victim's body lying on the floor below the sink. He said the blood was not "smudge[d]" as though the victim tried to get up after falling to the floor. He could not determine where the attacker stood.

Investigator Odom testified that after he collected evidence where the victims were found, he left the scene and went to the home on Rock House Road. He identified photographs of tire tracks and a small "burn pile" outside the home. He said that a rivet and a button from a pair of Paco jeans were found in the ashes of the burn pile. He denied finding jeans in the ashes. He identified a photograph of luggage bags on a bed found inside the home. He said the bags had male clothing inside. He said that a pair of Nike tennis shoes

was removed from Ms. Rose and that the shoes were sent to the Tennessee Bureau of Investigation (TBI) laboratory for analysis. Investigator Andy Clevinger told him the shoes belonged to Ms. Rose.

On cross-examination, Investigator Odom testified that Mr. Brown was stabbed on the right side of his throat, that a hole was in the victim's sweatshirt, and that it was possible the victim was stabbed through his clothing. He agreed that there were no signs of a struggle along the blood trail from the victim to the home and that the victim received his injuries while inside the home. He agreed that Mr. Gregg stood close to the kitchen counter when he was first stabbed and said that Mr. Gregg was on his knees or "bent over." He said that the burn pile was not warm and that he did not know when the pile was ignited.

Dr. William McCormick, an expert in forensic pathology, testified that he performed the victims' autopsies. He said Mr. Brown received a single stab wound to the right side of the neck that cut the right jugular vein and right subclavian artery and punctured the right lung. He said the wound was caused by a sharp object and was consistent with a "back blade" knife. He concluded that Mr. Brown bled to death and that his death was a homicide.

Dr. McCormick testified that Mr. Gregg received eight stab wounds to the head, face, and neck areas and cuts on his hands. He said the victim had three stab wounds to the neck. He said one of the neck wounds showed that the victim's internal jugular vein and carotid artery were cut. The other two wounds were not life-threatening. He said the wounds were caused by a sharp, pointed, back blade knife. He said the victim had two stab wounds on the left side of his face near the ear and three smaller cuts on the neck. He said the wound near the ear and just inside the victim's hairline penetrated the skull and struck the brain.

Dr. McCormick testified that the police gave him the knife found by Officer Harrah and that the knife had a back blade. He identified photographs showing the knife inserted in Mr. Gregg's skull. He concluded that the knife could have caused the victim's wounds. He could not conclude that the knife caused the injuries, only that it fit in the victim's wounds "perfectly." He concluded that Mr. Gregg bled to death and that the cause of death was a homicide.

Dr. McCormick testified that he did not find any defensive wounds on Mr. Brown and that he found three defensive wounds on the back of Mr. Gregg's right hand. He concluded Mr. Gregg's hand was "put up to prevent the attack." He said all the victims' wounds were the same age. He said that Mr. Brown had a blood alcohol concentration of .204 and that Mr. Gregg had a blood alcohol concentration of .189. He identified a photograph of Mr. Gregg's jeans with a $50 bill sticking out the back pants pocket.

On cross-examination, Dr. McCormick testified that he could not determine from which direction the knife came based on the victims' wounds. He said that although Mr. Gregg would have bled to death within a couple of minutes after receiving the fatal wound, a struggle could have continued before his death. He said it was possible that Mr. Gregg and the attacker were moving during a struggle when the wounds were inflicted. He agreed he did not know the significance of the $50 bill found in Mr. Gregg's pants pocket. He said that for trace evidence purposes, it was important to bag the hands of a victim and that the victims' hands were not bagged before arriving at his office.

TBI Special Agent Susan Lafferty, an expert in latent print analysis, testified that she received the knife found by the police and that she analyzed it for fingerprints. She said that although she saw "a few ridges" on the knife, there was not enough detail to perform a comparison for an identification. She concluded that there were no identifiable latent fingerprints on the knife.

TBI Special Agent Forensic Scientist Randall Nelson, an expert in trace evidence fire debris analysis, testified that he analyzed two cans of fire debris recovered from the Defendant's home and that he did not find any "ignitable liquid residues," such as gasoline, kerosene, diesel fuel, or other petroleum products. He said that it was possible no petroleum products were used but that it was also possible petroleum products were used but not detectable. He said an ignitable liquid might be consumed by fire or evaporate, leaving no trace of the liquid.

On cross-examination, Agent Nelson testified that the debris contained ash and items not fully disintegrated. He agreed that it was possible the items found in the debris would have been consumed completely by the fire if an ignitable liquid was used. He could not determine the age of the debris.

Johnson City Police Sergeant Kevin Peters testified that he and Investigator Deborah Dunn interviewed the Defendant on February 5, 2009. Although the video recording of the Defendant's police interview was played for the jury, the disc included in the appellate record has nothing on it. On cross-examination, he stated that Investigator Shaun Miller took photographs of the Defendant's hands. He agreed he interviewed Ms. Rose. He said he had never heard of Mr. Gregg before the victims were found. He did not recall whether he told Ms. Rose during the interview that the police knew all about Mr. Gregg.

Johnson City Police Investigator Shaun Miller testified that he collected DNA from the Defendant and photographed the Defendant's hands. He saw "several small nicks" on the Defendant's hands. Photographs of the Defendant's hands were received as exhibits. Johnson City Police Investigator Andy Clevinger testified that he helped search for evidence

at the home on Rock House Road. He identified a pair of Nike tennis shoes found at the home. He identified an envelope containing a sample of Ted Gregg's blood, which was received as an exhibit.

Patrick Ihrie, an expert in serology and DNA profile analysis, testified that he worked for the TBI crime lab at the time he analyzed a pair of Nike tennis shoes recovered from the Defendant's home. He said that the serology analysis of the shoes showed the presence of human blood and that the blood contained Ted Gregg's DNA profile. He said that he analyzed the knife found at the Defendant's home and that the "presumptive test" did not show the presence of blood. He said, though, blood might have been on the knife at some point. He said cleaning the knife could have removed any blood.

Johnson City Police Investigator Deborah Dunn testified that she was the lead investigator, that she interviewed Ms. Rose, that she was familiar with Ms. Rose's voice, and that she was familiar with the Defendant's voice from watching the recording of the Defendant's police interview. She identified a recording of several telephone calls made by the Defendant between February 7, 2009, and March 17, 2009, which were played for the jury.

On February 7, 2009, the Defendant spoke with his mother, Sue Ellen Howard. He said he told Ms. Rose to tell the police that he "did it" and that she saw the Defendant kill the victim in order for Ms. Rose to "get [their] kid back." In the same conversation, the Defendant told a woman named Vanessa, that

> a big black guy, but they ain't going to believe that . . . . Look, . . . once I grabbed the knife and chased the dude, because I thought it was him, it was too late. I had the knife in my hand . . . . So I got rid of evidence and made it look even worse on me. But, when I come up out of here, now that I think about it, there was a big black shadow in that kitchen.

In another phone call on February 7, 2009, the Defendant told Ms. Howard that "this s--- was over" fifty dollars. Ms. Howard accused Ms. Rose of planning the killings, and the Defendant said, "Well, if she had it planned, she had that big . . . black dude . . . in that . . . house." On February 8, the Defendant spoke with his sister, Lisa Howard, and denied killing the victims but said the police would not believe him if he claimed the "dude f------ stabbed him. He ran out [sic] the house. I chased him. I couldn't catch him. That's the end of the story." He said, "Now the other thing I could . . . do is [say that] 'I was just trying to cover it up. She's the one that did it.' And tell them to put her in here." The Defendant called Lisa Howard again on February 9, and said Ms. Rose "wouldn't even know, to be honest with you, I don't know if she remembers half the night anyway. She . . . [drank] at the bar and

[she] still drank probably five more drinks after that." He told Lisa that Ms. Rose "passed out at the . . . apartment."

On February 10 and 11, 2009, the Defendant spoke with his mother and sister multiple times. He attempted to determine a way for his sister and mother to speak with Ms. Rose and convince Ms. Rose to tell the police that the Defendant did not kill the victims. On February 13, the Defendant told his sister that he sent her a letter but that the letter was for Ms. Rose. On February 14, the Defendant told his sister that the letter explained what he needed Ms. Rose to do for him before his next court appearance.

On February 14, 2009, the Defendant called his sister and said the following:

I wasn't trying to get . . . dope off him. He wanted to borrow $50. He borrowed money from me before and paid it back. So I let him borrow it. . . . He said he got it at home. So great, I get it when I get home. You know, he said he give it to the old lady. He didn't. I got mad. We fought about it. I . . . took Ashley out to puke, and . . . the motherf------ are in there stabbing each other. I mean, its . . . simple, man. It's all in that letter. . . . We just got to work with it, work with her. . . .

On February 16, 2009, the Defendant told his mother that he mailed a letter to her, that the letter was for Ms. Rose, and that the letter needed to be burned after Ms. Rose read it. He said his sister was supposed to go over it with Ms. Rose that day. He said that Ms. Rose was the only person who could fix the situation and that all Ms. Rose needed to do was say the Defendant "didn't do it." He said the police could not arrest her for perjury because she was not under oath when she told the police that the Defendant killed the victims.

On February 19, 2009, the Defendant spoke to Ms. Rose. He said that Mr. Gregg came at him with a knife, that "they" were going to kill him, and that he "killed them." Ms. Rose told the Defendant that it could not have been self-defense because the Defendant stabbed Mr. Gregg eight times. The Defendant asked why it could not have been self-defense and said "he kept coming" at him. On March 17, the Defendant told Ms. Rose that he could help himself by telling "them" Ms. Rose did it. He said that he could "walk out" like she did and that Ms. Rose would be in jail. Ms. Rose denied participating in the killings, and the Defendant said he understood but that "they" did not know what happened.

Investigator Dunn testified that Ms. Rose stated she was drunk during the police interview. She said that she was in the same room with Ms. Rose for four hours, that Ms. Rose did not appear drunk, and that Ms. Rose seemed tired. She recalled the Defendant's referring to a meeting on Tuesday, February 17, 2009, in one of the telephone calls and

referring to a preliminary hearing two days later. She agreed that Ms. Rose was at the hearing and that the Defendant was only interviewed by the police once.

On cross-examination, Investigator Dunn testified that she spoke to Ms. Rose after her police interview five to seven times about the Defendant's family threatening Ms. Rose. She denied telling Ms. Rose that she could not make additional statements after her official statement was transcribed. She stated that around the time of the preliminary hearing, Ms. Rose said she wanted to change her statement and "make speculations." She told Ms. Rose not to speculate and to tell the truth.

Ashley Rose testified that the Defendant was her ex-boyfriend, that they dated for about two and one-half years, and that they lived together at the time of the killings. She said that it had been months since she last spoke to the Defendant but that she had spoken to him since his arrest. She said that on February 5, 2009, she and the Defendant went to Numan's, "drank a whole lot," and socialized with the victims and others. She stated that she had received a $3000 income tax return check, that she had cashed the check, and that the Defendant carried the money with him the night of the killings. She said the Defendant gave Mr. Gregg fifty dollars while at the bar.

Ms. Rose testified that everyone got along while at the bar and that everyone left after 2:00 a.m. She said she, the Defendant, and Ted Gregg left together and went to the victims' home. She stated that they arrived at the home between 2:00 and 3:00 a.m., that they went inside, and that she "passed out" on the sofa in the living room. She said that she woke to an argument between Mr. Gregg and the Defendant over fifty dollars and that Mr. Brown was in the living room. She said she went into the kitchen and saw the Defendant and Mr. Gregg standing about four feet apart. She said Mr. Brown followed her into the kitchen. She said that the Defendant asked her if Mr. Gregg gave her "the money" and that she told the Defendant, "No." She said that the Defendant swung his arm at Mr. Gregg, that she thought the Defendant punched Mr. Gregg, and that Mr. Brown "swung over her shoulders" from behind. She said the Defendant punched Mr. Brown while she stood between them. She denied seeing anything in the Defendant's hand. She said that Mr. Brown ran from the home, that the Defendant followed, and that she chased the Defendant attempting to make him stop. She said Mr. Gregg was still in the kitchen when she left. She did not remember Mr. Gregg's being stabbed.

Ms. Rose testified that she could not see Mr. Brown outside, that she lost sight of the Defendant for a few seconds, that the Defendant stopped chasing Mr. Brown and came to the front door where she stood, and that she told the Defendant they needed to leave. She told the Defendant her wallet was inside the home. She said the Defendant was angry and yelling at her, but she did not recall what the Defendant said. She vomited outside but could not

recall if the Defendant stood beside her at the time. She said that she and the Defendant went into the home, that she saw Mr. Gregg lying on the kitchen floor, and that she ran outside. She asked the Defendant what he did, and the Defendant stated, "[L]et's just f------ go right now." She denied walking into the kitchen. She and the Defendant left in her car. She said she saw a knife in the Defendant's hand during the drive home. She identified a photograph of the knife found outside the Defendant's home as the knife the Defendant had in his hand.

Ms. Rose testified that the Defendant was angry, "freaking out," and yelling at her and that they went home. She denied knowing what happened to the knife after they arrived home and said she went to sleep in the bedroom. She said the Defendant did not come to bed that night. She said that before the police arrived, she packed some belongings for herself and the Defendant because the Defendant wanted to leave. She said the Defendant wanted her to drive him to Michigan, where the Defendant previously lived.

Ms. Rose testified that before she and the Defendant left home to go to Numan's, there was not a burn pile in the backyard and that she saw a burn pile in the backyard around 10:00 the next morning before the police arrived. She denied burning anything and said the Defendant had burned things in the backyard before the night of killings. She said that although she did not see the Defendant burn anything that morning, the Defendant burned something because he was the only other person home. She denied seeing the Defendant burn anything.

Ms. Rose testified that the Defendant told her not to speak to the police. She denied the Defendant told her to blame him for the killings in order for her to stay out of jail and care for her children. She said she spoke to the Defendant after his arrest on the telephone but denied recalling what they discussed. Ms. Rose, Sue Ellen Howard, and Lisa Howard visited the Defendant in jail. Ms. Rose said she became scared of the Defendant.

On cross-examination, Ms. Rose testified that on February 4, 2009, she took three or four Xanax and one Soma before going to Numan's. She agreed that the Defendant returned to the victims' home almost immediately after chasing Mr. Brown outside the home. She agreed the Defendant told her to go into the victims' home to get her wallet before leaving. She said she drove her grandfather's gray Thunderbird that night.

The Defendant testified that he and Ms. Rose arrived at Numan's around 11:30 p.m. on February 4, 2009, and that the victims were already there. He said the four of them played pool and drank. He said that he had "quite a few" shots and beers and that the victims drank beer. He said that he bought several rounds of drinks because he had Ms. Rose's income tax money. He said Mr. Gregg asked to borrow fifty dollars to buy drinks and promised to repay him when the Defendant took him home that night. He said he carried about $2500 in cash

that night.  He said he left with Ms. Rose and Mr. Gregg around 2:00 or 2:30 a.m. and went to the victims' home.  He said there were no arguments on the way there.

The Defendant testified that after they arrived at the victims' home, they sat in the living room and reminisced.  He said that he and Mr. Gregg were friends, although it had been one and one-half years since they had seen each other.  He said that Ms. Rose passed out on the sofa and that Mr. Brown arrived about fifteen minutes later.  He said that Ms. Rose began to vomit, that he took her outside, and that he walked her back to the sofa.  He said he told Mr. Gregg they needed to leave and asked for the money.  He stated that Mr. Gregg said he gave the money to Ms. Rose.  The Defendant said he yelled for Ms. Rose, who came into the kitchen.  He said Ms. Rose denied Mr. Gregg's giving her any money.  He said Mr. Gregg said, "F-you and that fifty dollars . . . you need to give me the rest of the money that's in your pocket."  He said that he thought Mr. Gregg was joking and that he laughed a little.  He told Mr. Gregg, "[Y]ou're going to have to take it."  He said Mr. Gregg pulled out a knife and "came at" him.  He denied knowing where Mr. Gregg got the knife.  He said he "pulled" up his hand, grabbed the hand in which Mr. Gregg held the knife, and used his other hand to protect his face.  He said the knife cut his right hand.

The Defendant testified that he tried to take the knife from Mr. Gregg, that he "slammed" Mr. Gregg against the counter, that he jabbed the knife toward Mr. Gregg's neck and face, and that he saw blood.  He said that after he realized he could not take the knife from Mr. Gregg, he tried to stab Mr. Gregg.  He said he did not let go of the knife because Mr. Gregg would have stabbed him.  He said that while he and Mr. Gregg struggled over the knife, Mr. Brown entered the kitchen and jumped on his back.  He said he was 6'0" tall and weighed about 153 pounds, while Mr. Brown was taller and weighed about 220 pounds.  He said that Mr. Gregg let go of the knife and that Mr. Brown got off his back.  He said that Mr. Gregg tried to "get a hold of" him and that he "just blindly . . . put it up."  He denied knowing at that time that he stabbed Mr. Gregg.  He said he swung the knife, stabbing Mr. Gregg in the head.  He said the fight in the kitchen lasted no more than one minute.

The Defendant testified that Ms. Rose stood behind him when she entered the kitchen and that Mr. Brown pushed her out of the way when he entered the kitchen.  He said that after he stabbed Mr. Gregg, he swung in Mr. Brown's direction but that Mr. Brown was not there.  He said Mr. Brown fell against the door frame, got up, said, "I'll be back," and ran outside.  He said he chased Mr. Brown for about 100 yards.  He said Mr. Brown was still running when he stopped and returned to Ms. Rose.  He did not recall saying anything to Mr. Brown.  He said he told Ms. Rose to retrieve her belongings from the victims' home.  He said that he followed Ms. Rose inside and that they saw Mr. Gregg on the floor.  He said the knife was lying next to Mr. Gregg.  He said Ms. Rose went into the living room to get her wallet.

The Defendant testified that while Ms. Rose was in the living room, he performed CPR on Mr. Gregg but could not revive him. He said he was angry and scared. He said he picked up the knife and drove home. He said that he did not call 9-1-1 because he feared going to jail. He said that he took two Xanax when he and Ms. Rose arrived home because of an anxiety attack and that he did not remember what he did with the knife. He denied drinking alcohol and said Ms. Rose went to bed. With regard to the burn pile, he said that because of the Xanax, he did not know if he burned anything in the backyard.

The Defendant testified that he awoke at 8:37 the following morning and started packing his belongings because he wanted to leave. He said Ms. Rose told him to stay and tell the police what happened. He said he lied during the police interview because the police would not have believed him. He denied telling police officers that a "big black dude" or Ms. Rose killed the victims and admitted telling the police that the victims were arguing when he and Ms. Rose left the home. He said that his testimony was the truth and that he did what he thought he had to do. He apologized to the victims' families.

On cross-examination, the Defendant testified that the knife was in Mr. Gregg's hand during most of the struggle, that he used his left hand to grab the knife from Mr. Gregg's right hand, that he put his right hand in front of the blade, and that Mr. Gregg stabbed his right hand. He said that during the struggle, the knife shifted to Mr. Gregg's left hand. He denied intentionally stabbing Mr. Gregg in the neck three times and said Mr. Gregg had the knife in his right hand when these wounds were inflicted. He said that he started "gouging at [Mr. Gregg]" when Mr. Gregg refused to let go of the knife. He said the three small cuts below Mr. Gregg's left ear were also inflicted when they struggled over the knife and they each had both hands on the knife. He said that he "only swung one time with the knife free in [his] hand" and that it "was deep through" Mr. Gregg's head.

The Defendant testified that Mr. Brown came from behind, grabbed him by the shoulders, and tried to pull him away from Mr. Gregg. He said that before Mr. Brown was stabbed, Mr. Brown yelled at him and Mr. Gregg to stop. He denied knowing he had stabbed Mr. Brown when he swung the knife at Mr. Gregg's head. He said that he chased Mr. Brown when he ran away without looking at Mr. Gregg and that he did not know if Mr. Gregg was standing or lying on the floor. He said Mr. Brown was still in the kitchen when he last stabbed Mr. Gregg.

The Defendant testified that he did not see a trail of blood coming from Mr. Brown as he chased Mr. Brown outside. He said that about thirty to sixty seconds lapsed from the last time he stabbed Mr. Gregg to when he walked back to the home to retrieve Ms. Rose's wallet. He denied checking for Mr. Gregg's pulse.

The Defendant testified that Ms. Rose wore Nike tennis shoes the night of the killings, that he did not know what happened to the shoes he wore that night, and that to his knowledge, he did not burn his shoes. He said his memory was affected by the Xanax and agreed he could have burned his shoes. He said that he wore a pair of Paco jeans the night of the killings and that it was possible he burned the pants. He did not know if he threw the knife on the ground outside his home. On redirect examination, the Defendant stated that he was scared when Mr. Gregg lunged at him with the knife.

The Defendant was convicted of second degree murder for the death of Mr. Gregg and voluntary manslaughter for the death of Mr. Brown. He received consecutive sentences of twenty years for second degree murder and five years for voluntary manslaughter. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to sustain his convictions. He argues the State offered no proof to rebut his claim that he acted in self-defense. The State responds that the evidence is sufficient and that the jury rejected the Defendant's theory of self-defense. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S .W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this appeal, second degree murder is defined as the knowing killing of another. T.C.A. § 39-13-210(a)(1) (2010). Voluntary manslaughter "is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. at § 39-13-211(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. at § 39-11-302(b). "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." Id. at § 39-11-301(a)(2). "[A] person . . . acts intentionally with respect to the nature of the conduct or to a result of conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. at § 39-11-302(a).

The jury's verdicts reflect that it rejected the Defendant's claim of self-defense. Taken in the light most favorable to the State, the evidence shows that after falling asleep at the victims' home, Ms. Rose awoke to the Defendant and Mr. Gregg arguing over the fifty dollars the Defendant loaned Mr. Gregg earlier that evening. Ms. Rose told the Defendant that Mr. Gregg had not reimbursed her. After learning Mr. Gregg had not paid Ms. Rose, the Defendant swung at the victims several times. Dr. McCormick found three defensive wounds on Mr. Gregg's right hand. Ms. Rose saw Mr. Brown run from the home and the Defendant chase Mr. Brown, and she chased the Defendant attempting to make the Defendant stop chasing Mr. Brown.

A knife consistent with the victims' wounds was found outside the Defendant's home. Ms. Brown, who lived with the victims, identified the knife found by the police as one of her kitchen knives. Ms. Rose identified the knife as the one the Defendant had in his hand when they left the scene. A burn pile, which was not there before the Defendant and Ms. Rose left for Numan's the night of the killings, was found outside the Defendant's home hours after the killings and contained a button from a pair of Paco jeans. The Defendant admitted wearing a pair of Paco jeans that night and said it was possible he burned the pants. Mr. Gregg's blood and DNA were on Ms. Rose's tennis shoes found at the Defendant's home. The Defendant packed his belongings and asked Ms. Rose to drive him to Michigan.

In a telephone call two days after the killings, the Defendant told his sister that the killings were over fifty dollars. On February 16, 2009, the Defendant told his mother that Ms. Rose was the only person who could help him and that Ms. Rose only needed to tell the police that the Defendant did not kill the victims. He stated that Ms. Rose would not be charged with perjury because she was not under oath when she gave her statement to the police. In a telephone conversation with Ms. Rose, the Defendant said he would help himself by telling the police that Ms. Rose killed the victims when Ms. Rose expressed reluctance to change her statement. The Defendant told Ms. Rose that he "understood" she did not kill the victims. The Defendant created multiple stories justifying the killings or blaming them

on someone else, including a fictional African-American man. We conclude that the evidence is sufficient to sustain the Defendant's convictions.

## II

The Defendant contends that the trial court erred in allowing Chikenia Livingston to testify about Ashley Rose's out-of-court statement. He argues the evidence was hearsay, was prejudicial to his claim of self-defense, and violated his right to confront the declarant. The State contends that the trial court properly admitted the evidence and argues that the evidence was not hearsay because it was not presented to prove the truth of the matter asserted.

At the trial, Ms. Livingston testified that she heard a woman, later identified as Ms. Rose, telling the Defendant to calm down. Ms. Livingston saw Ms. Rose hold up her hands and say , "[N]o, no, no, no," while holding back the Defendant. She saw the Defendant push Ms. Rose and state, "I'm going to get that MF." The trial court found that the testimony was not subject to the hearsay rule because it was only offered "for the fact it was said."

Hearsay is a "statement . . . offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible unless it qualifies under an exception to the rule. Tenn. R. Evid. 802. "Hearsay is present only if the statement is used to prove the truth of the matter asserted in the statement. . . ." See Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[7] (6th ed. 2011). We agree that Ms. Rose's statements to the Defendant were not offered for the truth of the matter. Ms. Livingston's testimony about Ms. Rose's telling the Defendant to calm down and "no, no, no" while holding back the Defendant were offered to show what was said before the Defendant pushed Ms. Rose and said, "I'm going to get that MF." The Defendant's statement was admissible as an admission by a party opponent, and his actions were offered by the State to establish intentional and premeditated killings. See Tenn. R. Evid. 803(1.2).

## III

The Defendant contends that the admission of jail telephone conversations violated his due process rights. He argues his voice was not properly authenticated. The Defendant concedes waiver of the issue because he failed to include it in his motion for a new trial and asks us to consider it in the interests of justice as plain error. See T.R.A.P. 36(a). The State contends that plain error does not exist because consideration of the issue is not necessary to do substantial justice.

-16-

Our supreme court has adopted the factors developed by this court to be considered

when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

At the trial, the Defendant objected to the voice identification of the recording of the telephone calls played for the jury. In a jury-out hearing, Investigator Dunn testified that she watched the video recording of the Defendant's police interview more than once and that she interviewed Ms. Rose personally. She said she reviewed the jail calls and recognized the Defendant's and Ms. Rose's voices in the recording. She disagreed a person's voice sounded different on the telephone than in person. She said the Defendant's voice had distinct qualities, including a Northern accent. She said there were certain words that the Defendant used repetitively in the police interview and telephone calls, including a "profound use of profanity." She received the recording from the prosecutor and denied having training in voice identification. She said her conclusion that the caller was the Defendant was collectively based on her viewing his police interview more than once, comparing his voice to the voice on the recording, the context of the conversations, his speaking to "Ashley," and his distinct accent. The trial court agreed that the Defendant had a distinctive voice and found that Investigator Dunn's reasoning was logical. The trial court found that the proper voice authentication had been established.

Tennessee Rule of Evidence 901(a) states, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Lay opinion testimony "based upon hearing the voice at any time under circumstances connecting it with the alleged speaker" can be used to authenticate or identify the speaker in a recording. Tenn. R. Evid. 901(b)(5).

-17-

[I]f the witness has, at the time of testifying, adequate familiarity with the speaker's voice, he or she may opine whether the disputed testimony is the alleged speaker's voice. Familiarity can be gained in a relatively short period of time, and as the result of conversations occurring before or after the conversation that was identified.

Cohen et al., § 9.01[7], at 9-13 (citations omitted). "For authentication purposes, voice identification by a witness need not be certain; it is sufficient if the witness thinks he can identify the voice and express his opinion." Stroup v. State, 552 S.W.2d 418, 420 (Tenn. Crim. App. 1977).

Investigator Dunn became familiar with the Defendant's voice after reviewing the video recording of his police interview. She discussed the distinct qualities of the Defendant's voice heard in the police interview, including his "profound use of profanity" and Northern accent, and said she heard the same qualities in the telephone calls. She said the context of the conversations also supported a conclusion that the Defendant was the caller. The phone calls show that the caller was identified several times as "Ryan" and that he spoke to "Ashley" on several occasions. We conclude that the caller was sufficiently identified as the Defendant and that he is not entitled to relief.

**IV**

The Defendant contends that the trial court improperly declined to find any mitigating factors and improperly imposed consecutive sentencing. The State responds that the record supports the Defendant's effective twenty-five-year sentence. We agree with the State.

Although no testimony was presented at the sentencing hearing, the presentence report, disciplinary reports from the local detention center, and certified copies of the Defendant's previous felony convictions were received as exhibits. The record shows that the Defendant had previous felony convictions in Michigan for being a convicted felon in possession of a firearm in 2001 and breaking and entering into a dwelling with the intent to commit larceny in 1993. A Washington County Detention Center Disciplinary Report showed that on October 25, 2010, the Defendant admitted to damaging jail property, possessing contraband, and hoarding medication.

The trial court found that the Defendant "lied through his teeth" based on the police interviews and the recorded telephone calls. The court stated that the Defendant admitted in the telephone calls that he committed the offenses. Although the Defendant argued there was mitigation based on his trial testimony, the court discredited his trial testimony and declined to find any mitigating factors.

The trial court found that enhancement factors (1) and (9) applied. See T.C.A. §§ 40-35-114(1) (2010) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range") and -114(9) ("The defendant possessed or employed . . . [a] deadly weapon during the commission of the offense"). The court found that the Defendant had one prior felony conviction and various misdemeanor convictions, including marijuana possession, violation of the seatbelt law, domestic violence, disorderly conduct, assaulting a police officer, and public intoxication. The court noted that while the Defendant's breaking and entering felony charge was pending, the Defendant was arrested for assaulting a police officer and later convicted. The trial court found that the knife the Defendant used was a "sizeable" deadly weapon and that second degree murder could be committed without a weapon.

The trial court sentenced the Defendant as a Range I offender to twenty years' confinement for second degree murder at 100% service as a violent offender and as a Range I, standard offender to five years' confinement for voluntary manslaughter. The court found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that he had no hesitation about committing a crime when the risk to human life was high. The court noted the number of stab wounds and the manner of deaths and determined that consecutive sentencing was warranted.

Previously, this court's review of the length of a sentence was de novo with a presumption of correctness. T.C.A. §§ 40-35-401(d), -402(d) (2010). Recently, though, the Tennessee Supreme Court adopted a new standard of review for sentencing in State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Currently, length of sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" Id. at 708.

In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. Bise, 380 S.W.3d 68 at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper

application of the purposes and principles of our Sentencing Act." Id. at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id.

We conclude that the trial court did not err by declining to find any mitigating factors. At the sentencing hearing, the Defendant relied on his trial testimony to establish any mitigating factors. The trial court, though, discredited his testimony based on the Defendant's police interview and the telephone calls played at the trial. A determination of witness credibility is entrusted to the trial court as the fact finder, which may be considered during sentencing. State v. Thomas C. Russell, E2006-00827-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App. May 24, 2007), perm. app. denied (Tenn. Sept. 17, 2007). The record reflects that the trial court followed the statutory sentencing procedure, made findings of fact supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act. The trial court did not err.

With regard to the trial court's ordering consecutive sentencing, the determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states, in pertinent part, that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]

Our supreme court concluded that when the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995); see State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Although the trial court did not state on the record the required factual findings with regard to the Defendant's being a dangerous offender, we conclude that the record supports the imposition of consecutive sentencing and that the court implicitly found that consecutive

sentences were appropriate to protect the public from the Defendant's further criminal conduct and were reasonably related to the severity of the offenses. The court discussed the severity of the offenses committed and noted that Mr. Gregg received eight stab wounds to the head and neck and that Mr. Brown received a single stab wound to the neck. Both victims bled to death quickly. The Defendant attempted to justify his actions, including blaming the victims' deaths on a fictional African-American man standing in the shadows of the victims' home. The trial court also noted the Defendant's criminal history and found the Defendant was convicted of assaulting a police officer while his breaking and entering charge was pending. The record supports the conclusion that the consecutive sentencing was necessary to protect the public against further criminal conduct by the Defendant and was related to the severity of the offenses. See Lane, 3 S.W.3d at 461.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE